## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ANDREW S. CLYDE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Case 1:21-cv-01605-TJK |
| WILLIAM J. WALKER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Earl "Trey" Mayfield, D.C. Bar # 459998
tmayfield@jurisday.com
Juris Day, PLLC
10521 Judicial Dr., #200
Fairfax, Virginia 22030
Voice: (703) 268-5600
Facsimile: (703) 268-5602

Kenneth T. Cuccinelli, II
kcuccinelli@kencuccinelliattorneyatlaw.com
Ken Cuccinelli Attorney at Law
13881 Jordan Meadows Lane
Nokesville, Virginia 20181

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS………………………………………………………………………1

TABLE OF AUTHORITIES…………………………………………………………........ 2

PRELIMINARY STATEMENT……………………….......................................7

INTRODUCTION. ……………………………………………………………………7

STANDARD OF REVIEW……………………………………………………………...10

ARGUMENT…………………………………………………………………….…12

I.    The Court Has Jurisdiction To Provide Relief Against the Unconstitutional Conduct By Employees of the House of Representatives…………12

    A.  Supreme Court & D.C. Circuit Precedents Mandate That House Rules Subject to Allegations of Unconstitutionality Be Subject to Judicial Review………………12

    B.  Providing Security Screening & Administering Payroll Are Not Core Legislative Functions Covered By the Speech or Debate Clause……………………………15

    C.  House Employees Are Subject to Judicially-Imposed Relief to Prevent Illegal Conduct Even if the Members of Congress Who Authorized that Conduct Are Immune from Suit. …………………………………………………………………22

II.    Plaintiffs Have Stated Claims Upon Which Relief Can Be Granted………………...24

    A.  The Fines Levied Under the Rule Violate the Twenty-Seventh Amendment by Varying (Reducing) Members' Actual Compensation…………………………...24

        1.  A Primary Purpose of the 27th Amendment is to Prevent Congressional Salaries From Being Decreased, a Practice the Founders Expressly Recognized Could Be Used to Threaten the Integrity and Independence of Members, and Dissuade Individuals of Modest Means from Serving in Congress.. ………………………………..………………………24

        2.  House Resolution 73 is a "Law" that Varies Compensation in Violation of the 27th Amendment. …………………………………………………30

    B.  The Imposition of Fines for Behavior that is Not Disorderly is Beyond the Power of the House Under Article I, § 5. ……………………………………………37

    C.  The Arrest Clause Bars the Implementation of House Resolution 73 In A Manner that Denies Members the Ability to Speak, Debate & Vote. ……………………39

CONCLUSION.........................................................................................42

# TABLE OF AUTHORITIES

### *Cases*

*Am. Nat'l Ins. Co. v. FDIC*, 395 U.S. App. D.C. 316 (D.C. Cir. 2011) ........................................ 10

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) ......... 32

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ........................................................... 11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................... 11

*Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996) ................................................. 11

\*   *Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019) ................................................... 16, 19, 20, 21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................... 11

\*   *Boehner v. Anderson*, 30 F.3d 156 (1994) ........................................................ 14, 18, 31

*Callins v. Collins*, 510 U.S. 1141 (1994) ................................................................ 30

*City Bank of New Orleans*, 44 U.S. 292 (1844) ............................................................ 39

*Columbia Broadcasting System, Inc. v. U.S.*, 316 U.S. 407 (1942) .................................... 32

*Conley v. Gibson*, 355 U.S. 41 (1957) ..................................................................... 11

*Consumers Union of U.S., Inc. v. Periodical Correspondents' Assoc.* 515 F.2d 1341 (D.C. Cir. 1975) ............................................................................................. 12, 18, 19

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................................... 30

*Doe v. McMillan*, 412 U.S. 306 (1973) ............................................................. 15, 16, 23

*Dombrowski v. Eastland* 387 U.S. 82 (1967) ............................................................... 22

*Engel v. Vitale*, 370 U.S. 421 (1962) ..................................................................... 26

*Ex parte City Bank of New Orleans*, 44 U.S. 292, 313 (1844)…………………………………….37

*Exxon Corp. v. FTC*, 589 F.2d 582 (D.C. Cir. 1978).................................................... 31

*Foucha v. Louisiana*, 504 U.S. 71 (1992)................................................................. 40

*Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021) .................................................. 29

*Goldwater v. Carter,* 617 F.2d 697 (D.C. Cir. 1979), v*acated on other grounds* ................ 13, 14

\*   *Gravel v. U.S.*, 408 U.S.606 (1972) ................................................................. *passim*

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................................................... 15

*Horne v. Dept. of Agric.,* 576 U.S. 351 (2015) ..................................................... 27

*In re Winship*, 397 U.S. 358 (1970) ....................................................................... 40

*Jones v. Horne*, 634 F.3d 588 (D.C. Cir. 2011) ..................................................... 11

*Jordan v. Hutcheson*, 323 F.2d 597 (4th Cir. 1963) .............................................. 31

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure, Ltd.,* 536 U.S. 88 (2002).......... 27

*Kennedy v. Sampson,* 511 F.2d 430 (D.C. Cir. 1974) ............................................ 14

\*   *Kilbourn v. Thompson*, 103 U.S. 168 (1880) ............................................ 15, 21, 22, 37

*Kisor v. Wilkie*, 139 S.Ct. 2400 (2019) .................................................................. 26

*Law* v. *Siegel*, 571 U.S. 415 (2014) ....................................................................... 32

*Long v. Ansell*, 293 U.S. 76 (1934)........................................................................ 40

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)...................................................... 10

*Marshall Cnty. Health Care Auth. v. Shalala,* 988 F.2d 1221 (D.C. Cir. 1993) .......... 11

*McCarthy v. Pelosi,* 2021 U.S. App. LEXIS 21399  (D.C. Cir. July 20, 2021) .............. 15, 16, 23

*McGrain v. Daugherty*, 273 U.S. 135 (1927) ......................................................... 26

*Michel v. Anderson* 14 F.3d 623, 627 (D.C. Cir. 1994)......................................... 34

*Moore v. U.S. House of Rep.,* 733 F.2d 946 (D.C. Cir. 1984) .................................. 14

*Neal v. Delaware*, 103 U.S. 370 (1881).................................................................. 36

*NLRB v. Noel Canning*, 573 U.S. 513 (2014) .................................................... 12, 34

\*   *Powell v. McCormack* 395 U.S. 486 (1969) ...................................................... *passim*

*Ramos v. Louisiana*, 140 S.Ct. 1390 (2020) .......................................................... 40

*Rangel v. Boehner*, 785 F.3d 19 (D.C. Cir. 2015) ................................... 15, 16, 20, 22

*Rucho v. Common Cause*, 139 S.Ct. 2484 (2019) .................................................. 28

*Sch. Dist. of Abingon Twp. v. Schemp*, 374 U.S. 203 (1963)................................. 28

*Schaffer v. Clinton*, 240 F.3d 878 (10th Cir. 2001) .............................................. 30

*Scialabba* v. *Cuellar de Osorio*, 573 U.S. 41, 60 (2014)………….. ……………………………....32

*Singer v. U.S.*, 380 U.S. 24 (1965)................................................................. 28

*Timbs v. Indiana*, 139 S.Ct. 682 (2019) .......................................................... 25

*Torres v. Madrid,* 141 S.Ct. 989 (2021) ...................................................... 30, 40

*U.S. Term Limits v. Thonrton*, 514 U.S. 779 (1995)........................................ 28

\*     *U.S. v. Ballin*, 144 U.S. 1 (1892) ............................................................. *passim*

\*     *U.S. v. Brewster*, 408 U.S. 501 (1972) ................................................... 16, 21

*U.S. v. Cabrales*, 524 U.S. 1  (1998) ............................................................. 26

*U.S. v. Hvass*, 355 U.S. 570 (1958) .......................................................... 32, 34

*U.S. v. Johnson*, 383 U.S. 169 (1966) ............................................................ 21

*U.S. v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995)................................. 13, 31

*U.S. v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ............................................ 33

*Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C. Cir. 1983) .................................. 14

\*     *Walker v. Jones*, 733 F.2d 923 (D.C. Cir. 1984) ..................................... *passim*

*Washington Activity Group v. White*, 342 F.Supp. 847, 848-50, 852-55 (D.D.C. 1971), *aff'd*, 479 F.2d 922 (D.C. Cir. 1973) ......................................................................... 34

*Watkins v. U.S.*, 354 U.S. 178 (1957) ............................................................ 31

*Weiss v. U.S.*, 510 U.S. 163  (1994)............................................................... 28

*Williamson v. U.S.*, 207 U.S. 425 (1908) ....................................................... 40

*Yellin v. United States*, 374 U.S. 109 (1963) ........................................... 13, 31

### *Rules*

H. Res. 73 § 1(a)(1)............................................................................ *passim*

Fed.R.Civ.P. 8……………………………………………………………………....…11

Fed.R.Civ.P. 12…………………………………………………………….…………17

Fed.R.Civ.P. 12(b)(1)………………………………………………………....……7

Fed.R.Civ.P. 12(b)(6) ………………………………………………..…….……7, 11

### Constitutional Provisions

U.S. Const., Amend. I .......................................................................................... 33

U.S. Const., Amend. VIII……………….………………………………..…………………..26

U.S. Const., Amend. XV ……………….………………………………………………..36

U.S. Const., Amend. XVIII ……………….………………………………………………..27

U.S. Const., Amend. XXVII .......................................................................................... *passim*

U.S. Const., Art. I, § 2, cl. 2……………….………………………………………………7

U.S. Const., Art. I, § 5, cl. 2……………….……………………………...…………….…..*passim*

U.S. Const., Art. I, § 6, cl.1 ……………….……………………………………...…….…*passim*

### Statutes

2 U.S.C. § 4523 .......................................................................................... 36

### Journals and Treatises

Bernard Bailyn, The Ideological Origins of the American Revolution 46-51, 85-93, 130-138
    (enlarged ed. 1992) .......................................................................................... 26

Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh
    Amendment*, 61 FORDHAM L. REV. 497, 521-31 (Dec. 1992) .................................. 24, 25, 26, 27

Black's Law Dictionary, 6th ed., 1991 (abridged) .......................................................... 38

Edmund Cody Burnett, The Continental Congress (1941)……………………………………27

GianCarlo Canaparo & Paul J. Larkin, Jr., *The Twenty-Seventh Amendment: Meaning and
Application*, Harv. J.L & Pub. Pol'y (Sept. 2, 2021)………………………………………35

Jack P. Greene, The Quest for Power (1963)……………………………………………….27

Alexander Hamilton, *Federalist Paper No. 79* (May 28, 1788)................................... 30

Justice John Marshall Harlan: *Lectures on Constitutional Law, 1897-98, Lecture 7, Nov. 20,
    1897*, 81 GEO. WASH. L. REV. Arguendo 12, 84 (July 2013) ................................... 38

Ken Herman, Herman: *35 Years Later, A+ for Austinite Who Got Constitution Amended?*
    Austin-American Statesman (March 14, 2017) ......................................................... 25

Samuel Johnson, A Dictionary of the English Language, (1785)................................. 38

Robert P. Ludlum, *The Antislavery 'Gag-Rule': History and Argument,* 26 J. OF NEGRO HIST. No. 2 at 210-11 (April 1941) (internal citation omitted). ........................................................ 33

Richard B. Morris, The Forging of the Union, 1781-1789, at 91-94 (1987)……………………....27

1 Edward Porritt with Annie G. Porritt, The Unreformed House of Commons: Parliamentary Representation Before 1832, at 151-203 (1909)........................................................................ 26

Jack N. Rakove, The Beginnings of National Politics: An Interpretive History of the Continental Congress 235-38 (1979)…………………………………………………………………...…..27

### Other Authorities

Cong.Globe, 32d Cong., 2d Sess. (1852))…………………………………………………………19

Cong.Directory, 50th Cong., 1st Sess. (1888) ………………………………………………….....19

53 Cong.Rec. 1214 (1916) ………………………………………………………………………….19

*Consumers Union*, 515 F.2d at 1343. …………………………………………………………....19

Creating the Bill of Rights: The Documentary Record from the First Federal Congress) (Helen E. Veit et al. eds. 1991……………………………………………………………………………………24

Debates in the House of Representatives (Aug. 14, 1789), *in* The Congressional Register, Aug. 14, 1789.................................................................................................................................... 29

https://abcnews.go.com/Politics/pelosi-claims-enemy-house-representatives/story?id=75538842 ........................................................................................................................................ ..9

https://history.house.gov/Historical-Highlights/1851-1900/A-Near-Gun-Fight-on-the-House-Floor/.................................................................................................................................... 39

https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/ ............................................................................................ 8

*https://www.smithsonianmag.com/history/where-did-term-gerrymander-come-180964118/*...... 28

The Beginnings of National Politics: An Interpretive History of the Continental Congress 235-38 (1979)...................................................................................................................................... 29

The Eighteenth-Century Constitution: 1688-1815, at 151-52 (E. Neville Williams ed., 1960)... 26

The Records of the Federal Convention of 1787, at 20-22 (Max Farrand ed., 1937)............. 28, 29

## PRELIMINARY STATEMENT

Plaintiff Members of Congress Clyde, Gohmert, and Smucker oppose Defendants'
Motion to Dismiss ("Motion") brought under Fed.R.Civ.P. 12(b)(1) and (6).  Although
Defendants present their enforcement of House Resolution 73 as a mere safety measure, the
reality is that this measure is being actively used to harass members of the House minority party
and prevent them from performing their constitutional duties of representation through speaking,
debating, and voting on the Floor of the House.  As written and implemented, House Resolution
73 transgresses several important safeguards of the American People's right to be represented by
Members of their choosing, including the 27th Amendment's protection against salary
diminution and Article I's measures to ensure that all Members can actively participate in the
House's most vital proceedings.  Defendants' efforts on behalf of the House majority party are
unconstitutional, and their Motion should be denied.

## INTRODUCTION

The Civil War Era entailed one of the tensest periods of service in the House of
Representatives in American history.  But even during the run-up to and through the War, no
Member was excluded by the House under the guise of not meeting the qualifications found in
the Constitution.  *See* U.S. Const., Art. I, § 2, cl. 2.  However, in the War's aftermath, the House
majority party of the era cast aside respect for proper constitutional limitations, as the Supreme
Court recited in *Powell v. McCormack*:

> [D]uring the stress of civil war [], the House of Representatives declined to exercise
> the power (to exclude), even under circumstances of great provocation. The
> abandonment of such restraint, however, was among the casualties of the general
> upheaval produced in war's wake. In 1868, the House voted for the first time in its
> history to exclude a member-elect. It refused to seat two duly elected
> representatives for giving aid and comfort to the Confederacy. This change was
> produced by the North's bitter enmity toward those who failed to support the Union
> cause during the war, and was effected by the Radical Republican domination of
> Congress. It was a shift brought about by the naked urgency of power and was given
> little doctrinal support.

7

395 U.S. 486, 544 (1969) (cleaned up) (citations omitted).  Sadly, but similarly, in either a fit of pique or simply to gain political advantage, the current majority of the House of Representatives seeks to use its rulemaking authority to punish duly-elected Members by methods expressly prohibited under the Constitution.  *See United States v. Ballin*, 144 U.S. 1, 5 (1892).

Instead of the Reconstruction era, which was the setting of the first unconstitutional exclusion from the House discussed in *Powell*, the current House majority rationalizes its unconstitutional actions in punishing select Members by invoking the violence of January 6, 2021.[1]  That excuse is unavailing.

In this case, the Defendant agents of the House of Representatives have been called upon by the Democratic majority to exercise power in derogation of the Constitution, and in a manner that is directed against only Members from the minority Republican Party.  Specifically, the Sergeant-at-Arms has been both "authorized and directed" to impose fines on Members who do not complete security screening, which is incorrectly presumed to constitute disorderly behavior. H. Res. 73 § 1(a)(1); U.S. Const., Art. I, § 5, cl. 2.  Such fines levied against Members' salaries violate the 27th Amendment by lowering their compensation from what it previously was in the same session in which House Resolution 73 (hereafter "H.R. 73," "the Resolution," or "the Rule") was enacted, and the fines are implemented by means of an arrest that detains Members

---

[1] Defendants' Motion literally starts with its hyperbolic reference to "insurrectionists" on the very first line of their brief.  Mot. at 1.  However, prior to the filing of Defendants' Motion to Dismiss, the FBI and Justice Department had already been reported to have found no evidence supporting Defendants' claim of insurrection, and have not charged any of the January 6, 2021 rioters with insurrection or any similar charge.  *See* https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/ Additionally, at least up until the filing of the Amended Complaint in this case, there was no suggestion or intelligence that any Member of the House of Representatives was suspected in any way of being a threat to any other Member.  Am. Compl. ¶ 39.

and impairs their ability to participate in all speech, debate, and votes on the Floor of the House. U.S. Const., Amend. XXVII; Art. I, § 6, cl.1; Am. Compl. ¶¶ 27-29.

Under the Supreme Court's holding in *Ballin*, the federal courts may hear cases in which the House, by its rules, has "ignore[d] constitutional restraints or violate[d] fundamental rights," or where there is no "reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained." 144 U.S. at 5. Defendants have implemented and enforced H.R. 73 beyond the restraints placed on the House by the Constitution, and there is no reasonable relation between the methods of implementation of H.R. 73 and the result which is sought to be attained. Specifically, while Defendants' Motion lists several "purposes" the Resolution purportedly serves,[2] the Resolution is enforced only against members of the minority party in the House.[3] Members of the majority party have repeatedly violated the Resolution's requirements as (selectively) implemented by Defendant Sergeant-at-Arms and accessed the House Floor, with no resultant violence, and no disruption to House proceedings. Nor has any Member of the majority party, including the Speaker herself, been fined for violating the rule. *Id.*

Furthermore, just days before the adoption of the Resolution, the Speaker of the House – under whose direction both Defendants act – asserted that "the enemy is within the House of Representatives," and when asked to clarify, she said that: "[w]e have members of Congress who … have threatened violence on other members of Congress."[4] These patently false public statements are part of a contrived political narrative in which the House majority party paints the

---

[2] *See* Mot. at 1.

[3] *See* Am. Compl. ¶¶ 13-17, 27 & 29.

[4] https://abcnews.go.com/Politics/pelosi-claims-enemy-house-representatives/story?id=75538842 (viewed September 13, 2021).

elected members of the minority party as a literal physical danger to their fellow Representatives. To that end, the majority party is abusing the House's rulemaking power to implement House Resolution 73 in furtherance of its political narrative, not to achieve the goals Defendants claim in their Motion to Dismiss.

While the House doubtless has the authority to promulgate rules to ensure safety and to discipline Members, it may not implement unconstitutional rules to effectuate those legitimate objectives.  The federal courts do not have the authority to instruct the House how it should best accomplish those objectives.  They do have the authority–and the obligation–to enjoin the House from implementing rules that violate the Constitution.  The House cannot, as it has done here, lower the compensation of Members in the same session in which the rule accomplishing that outcome was passed by garnishing their salaries.  The House cannot fine Members for conduct that is not disorderly. And the House cannot functionally arrest Members by detaining them on their way to the House Floor to carry out their constitutional duties as the Representatives of the American People.  The methods the House has chosen under H.R. 73, both textually and as implemented, violate the Constitution, and Defendants' Motion to Dismiss, must accordingly be denied.

## <u>STANDARD OF REVIEW</u>

"When reviewing a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court 'assumes the truth of all material factual allegations in the complaint and construes the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up).  Plaintiffs bear the burden of establishing subject matter jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

When reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept as true all the factual allegations in the Complaint and construe all reasonable inferences therefrom in the light most favorable to Plaintiffs. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Atchinson v. District of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996). Furthermore, the court must "draw all reasonable inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).   Through this lens, the Court must determine whether the well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As the District of Columbia Circuit has emphasized, the plausibility standard does not impose a "probability requirement" at the pleading stage, but simply asks whether the Complaint presents sufficient facts to "permit a reasonable inference" that the Plaintiffs have stated a claim. *Jones v. Horne*, 634 F.3d 588, 595 (citing *Ashcroft*, 556 U.S. 662, 677) (D.C. Cir. 2011).   Moreover, a court may take judicial notice of public documents in a Rule 12(b)(6) dismissal motion without converting it to one for summary judgment. *Marshall Cnty. Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226, n. 6 (D.C. Cir. 1993).

In *Conley v. Gibson*, 355 U.S. 41 (1957), the Supreme Court explained the interplay between Rule 8 (minimum pleading requirements) and Rule 12(b)(6) as follows: "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46. In *Bell Atlantic,* the Court clarified the "no set of facts" test by holding that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint[.]" *Id*. at 563. The *Bell Atlantic* Court emphasized: "*Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id*.

11

**ARGUMENT**

**I.      The Court Has Jurisdiction To Provide Relief Against the Unconstitutional Conduct By Employees of the House of Representatives.**

Defendants, the Sergeant-at-Arms and Chief Administrative Officer of the House of Representatives, assert that because they are House employees, and because Members of the House engage in speech and debate, that they, as employees, inherit the immunity from suit encapsulated in the Constitution's Speech or Debate Clause.  *See* U.S. Const., Art. I, § 6, cl. 1. They are wrong.  Longstanding precedent from both the Supreme Court and D.C. Circuit holds not only that congressional rules and practices are subject to judicial review where a constitutional violation is alleged, but that congressional staff are subject to federal court jurisdiction when the challenged conduct is not a speech or debate function.  Here, the congressional staff functions at issue–providing security and engaging in payroll deductions–are purely administrative in nature, and not within the Speech or Debate Clause's ambit.

**A.  Supreme Court & D.C. Circuit Precedents Mandate That House Rules Subject to Allegations of Unconstitutionality Be Subject to Judicial Review.**

The circumstances under which House rules are susceptible to judicial review were established in *U.S. v Ballin*, 144 U.S. 1 (1892) (*reaff'd, NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014)).  As the D.C. Circuit observed in *Consumers Union of U.S., Inc. v. Periodical Correspondents' Assoc.,* the general rule under *Ballin* is that each house of Congress's "power to make rules" under Art. I, § 5 "is a continuous power, always subject to be exercised by the house" and "absolute," but "within the limitations suggested [in the *Ballin* opinion]."  515 F.2d 1341, 1347 (1975) (quoting *Ballin*, 144 U.S. at 5) (emphasis added).  Thus, while the House ordinarily has substantial authority to enact rules free from judicial review, that authority has outer limits, whereupon judicial scrutiny is appropriate: "[1] It may not by its rules ignore constitutional restraints or [2] violate fundamental rights, and [3] there should be a reasonable

relation between the mode or method of proceeding established by the rule and the result which is sought to be attained." *Ballin*, 144 U.S. at 5.  All three circumstances exist here.

Each claim in this case is directed to the House exceeding the boundaries of its constitutional power.  Running afoul of *Ballin*, the House has *ignored the constitutional restraints upon its rulemaking authority*.  First, Plaintiffs allege that the implementation of punitive fines under House Resolution 73 via salary deductions explicitly violates the prohibition against salary reductions of the 27th Amendment to the Constitution.  Am. Compl., ¶¶ 30-35.  Second, Plaintiffs allege that House Resolution 73 punishes members for behavior that is not "disorderly," thereby exceeding the express limitation on the House's power to punish its own Members under Article I, § 5, Clause 2 of the Constitution.  Am. Compl. at ¶¶ 36-37, 39 & 41.  Third, Plaintiffs allege that the implementation of House Resolution 73 abrogates the protections for Members against arrest under Article I, § 6, Clause 1 of the Constitution by means of detaining and preventing Members from reaching the floor of the House to speak, debate, and vote, accomplishing that result through the threat of massive fines.  Am. Compl. at ¶¶ 36, 38 & 40-41.

"It has long been settled . . . that rules of Congress and its committees are judicially cognizable."  *Yellin v. United States,* 374 U.S. 109, 114 (1963) (internal citations omitted).  And, "it is perfectly clear that the Rulemaking Clause is not an absolute bar to judicial interpretation of the House Rules." *U.S. v. Rostenkowski*, 59 F.3d 1291, 1305 (D.C. Cir. 1995).  Indeed, the D.C. Circuit has already held that a congressman's 27th Amendment salary alteration claim against the Clerk of the House of Representatives is judicially cognizable.  *Boehner v. Anderson*, 30 F.3d 156, 160 (1994).  In that same case, the Court of Appeals acknowledged the federal courts' obligation to exercise jurisdiction "when a congressman suffers an effective nullification of his vote, or if his influence is substantially diminished."  *Id.* (citing *Goldwater v. Carter,* 617 F.2d

697, 702-03 (D.C. Cir. 1979) (*en banc*), *vacated on other grounds,* (the Congress had no way to block the President's action terminating a treaty without Senate consent)); *Kennedy v. Sampson,* 511 F.2d 430 (D.C. Cir. 1974);  *Moore v. U.S. House of Rep.,* 733 F.2d 946, 951-52 (D.C. Cir. 1984) (where Senate originated revenue bill, Representative deprived of constitutionally guaranteed opportunity to debate and vote on same prior to Senate action); *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C. Cir. 1983) (minority party congressmen have standing to challenge dilution of influence when assigned less than proportionate number of committee seats). Plaintiffs have alleged just such a violation of their fundamental rights of representation here.[5]

Furthermore, the *Ballin* Court's condition that "there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained" is violated by House Resolution 73's implementation through (1) the use of salary deductions; and (2) the use of magnetometers in such a way that Members miss votes – their single most important duty to their constituents and the Nation. While the House certainly has the constitutional authority to enact rules for discipline and safety, it may not do so by unconstitutional means.

Hence, there can be no dispute that House rules, or the implementation of those rules, are subject to judicial review where a plausible constitutional violation is alleged.  Defendants do not contest this principle.  Instead, they seek to torture the Speech or Debate Clause beyond recognition to mean its opposite: Instead of denoting a specific legislative function, Defendants would have Speech or Debate encompass underline all functions performed within the legislative branch, regardless of whether those functions are even legislative, much less speech or debate.  As

---

[5] The *Boehner* court held that altering a congressional salary in violation of the 27th Amendment would comprise both an official and a personal injury to the Member.  30 F.3d at 160.

common sense would suggest, performing security and administering payroll, are neither legislative, nor speech, nor debate.  Precedent confirms that understanding.

### B. Providing Security Screening & Administering Payroll Are Not Core Legislative Functions Covered By the Speech or Debate Clause.

The Speech or Debate Clause does not insulate from suit legislative functionaries carrying out nonlegislative tasks.  *Doe v. McMillan*, 412 U.S. 306, 315 (1973).  Congressional employees may accrue Speech or Debate immunity from suit "insofar as the conduct of the [employee] would be a protected legislative act if performed by the Member himself."[6]  *Rangel v. Boehner*, 785 F.3d 19, 24-25 (D.C. Cir. 2015) (quoting *Gravel v. U.S.*, 408 U.S. 606, 618 (1972)).  "Legislative acts are those 'generally done in a session of the House by <u>one of its members in relation to the business before it</u>.'"  *McCarthy v. Pelosi,* 2021 U.S. App. LEXIS 21399 at *7 (D.C. Cir. July 20, 2021) (emphasis added) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204, (1880)).  In general, the Supreme Court has followed a functional approach to legislative immunity.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 810 (1982).  "The key consideration, the Supreme Court cases teach, is the *act* presented for examination, not the *actor*."  *Rangel*, 785 F.3d at 25 (emphasis added by *Rangel*), (quoting *Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir. 1984) (Ginsburg, J.)).

"Legislative acts are not all-encompassing" of the Speech or Debate Clause.  *Gravel v. United States*, 408 U.S. 606, 625 (1972).  "The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed

---

[6] Though they brush quickly past it, Defendants concede this crucial distinction between legislative and nonlegislative acts.  Mot. at 10.

legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Id.*

In *Rangel*, the D.C. Circuit summarized the kind of legislative activities that fall within the Speech or Debate Clause for both Members and employees: preparing committee reports, conducting hearings, conducting investigations, committee staff using documents for official business, communications between a congressman and his staff regarding legislative business, selecting witnesses, bill drafting, staff members' preparations for legislative activities, and, of course, voting. 785 F.3d at 24-25 (collecting cases); *see also*, *McCarthy*, 2021 U.S. App. LEXIS 21399 at *7-8 ("rules governing how Members may cast their votes [ ] concern core legislative acts").  By contrast, numerous activities well within the normal course of a legislator's and congressional staff duties have been held <u>not</u> to be protected by the Speech or Debate Clause: Contacting executive branch employees and agencies and seeking to influence them, privately publishing documents obtained in the course of congressional duties; assistance in obtaining government contracts, preparing constituent newsletters, press releases, speeches and documents delivered outside of Congress  *See, e.g., Gravel*, 408 U.S. at 624-26; *U.S. v. Brewster*, 408 U.S. 501, 512-13; *Doe v. McMillan*, 412 U.S. at 317. Moreover, nonlegislative functions occurring within the legislative branch, such as an opening prayer by a chaplain employed by the House, or personnel actions in the course of superintending congressional food service facilities, are also plainly not subject to the Clause's immunity.  *See, e.g., Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019); *Walker*, 733 F.2d at 930-32.

As then-Judge Ginsberg pointed out in *Walker,* the argument that every administrative function performed by the House falls within the Speech or Debate Clause is "far-fetched." *Walker*, 733 F.2d at 931.  In *Walker*, a woman who managed the House of Representatives' restaurants brought suit for unlawful discharge against the Congressman who chaired the

subcommittee overseeing the restaurants and his staff director.  *Id.* at 925.  The defendant

Congressman and staffer moved to dismiss the suit under Fed.R.Civ.P. 12, invoking the Speech

or Debate Clause immunity under the theory that the plaintiff's discharge was a "legislative act

because it was reached and effected in committee" and that "food service caters to a need

essential to the [House's] internal functioning."  *Walker*, 733 F.2d at 925, 927.  Judge Ginsburg

made short work of this argument, explaining:

> Personnel who attend to food service, medical care, physical fitness needs, parking,[7] and haircutting for members of Congress no doubt contribute importantly to our legislators' well-being and promote their comfort and convenience in carrying out Article I business. But these staff members, unlike those who help prepare for hearings or assist in the composition of legislative measures, cater to human needs that are not "intimately cognate," *Davis v. Passman*, 544 F.2d at 879, to the legislative process.  The "fundamental purpose" of the Speech or Debate Clause is to "free the legislator from executive and judicial oversight that realistically threatens to control his conduct *as a legislator*." *Gravel v. United States*, 408 U.S. at 618 (emphasis added). <u>Auxiliary services attending to human needs or interests not peculiar to a Congress member's work qua legislator may advance a member's general welfare. To characterize personnel actions relating to such services as "legislative" in character, however, is to stretch the meaning of the word beyond sensible proportion.</u> Selecting, supervising, and discharging a food facilities manager, we believe, is not reasonably described as work that significantly informs or influences the shaping of our nation's laws.
>
> Nor do we grasp why consideration or a vote in committee should place all personnel superintendence of auxiliary services of a nonlegislative character inside a legislative sphere. Assuming arguendo that anything done in committee is necessarily a legislative act, Walker's <u>complaint against [the defendant congressman and staff director] nonetheless survives a Rule 12(b) motion.</u>

*Walker*, 733 F.2d at 931 (cleaned up) (italics in original) (underline added).  Simply put, the

constitutional test for speech or debate tracks the common-sense notion that the vast array of

administrative functions performed by the House do not fall within the Speech or Debate Clause

---

[7] It bears noting that "parking" refers to a security function, such as protecting and restricting access to parking garages for the benefit of Members, it is not merely a convenience for Members.

unless they are integral to the core legislative functions of deliberation and communication among members concerning the public's business.

Defendants point to no contrary case suggesting that their administrative functions of security and payroll might constitute "legislative acts."  Nor can they, because "the Clause has not been extended beyond the legislative sphere."  *Gravel*, 408 U.S. at 624-25.

Defendants invoke *Consumers Union of U.S. v. Periodical Correspondents' Ass'n* for the proposition that by merely adopting internal disciplinary rules, the "administration and enforcement" of such House rules "are obviously legislative acts that fall squarely within the Clause."  Mot at 11, citing *Consumers Union*, 515 F.2d 1341 (D.C. Cir. 1975).  But *Consumers Union* says no such thing.  That case involved the refusal of the houses of Congress (through their employees and delegees) to accredit a certain periodical for the press gallery.  *Consumers Union*, 515 F.2d at 1342.

*Consumers Union* rested on two rationales, neither of which are applicable here.  First, the court noted the right of each house under Art. I, § 5 to determine its own rules has since the first Congress always included the authority to decide whether and which members of the public–particularly the press–have access to its proceedings.  *Id.* at 1343-47.  "Under th[ese] circumstances," the case was "nonjusticiable because it involves matters committed by the Constitution to the Legislative Department."  *Id.* at 1346.  By contrast, the instant case involves three constitutional limitations on congressional rules that were not present in *Consumers Union*: (1) the prohibition on salary alteration under the 27th Amendment; (2) the prohibition against punishing members for behavior that is not "disorderly" under Article I, § 5, Clause 2; and (3) the prohibition against arresting Members so as to prevent them from reaching the floor of the House to speak, debate, and vote under Article I, § 6, Clause 1.  As made manifest in the foregoing discussions in *Ballin* and *Boehner*, transgressions of limitations contained in the

Constitution are plainly justiciable, a point this Court reiterated in *Barker* just two years ago.

*Barker*, 921 F.3d at 1128 ("Congress may not by its rules ignore constitutional restraints or

violate fundamental rights.") (cleaned up) (quoting *Ballin*, 144 U.S. at 5).

Second, and as the D.C. Circuit emphasized in *Barker v. Conroy* (which explicated

*Consumers Union*), the Speech or Debate Clause was implicated in *Consumers Union* precisely

because allowing press access to Congress brought with it direct press interference in

congressional deliberations:

> Essential to that determination [in *Consumers Union*] was the fact that Congress
> itself had developed the press gallery rules to protect legislators' independence:
> Congress designed the rules to ensure that the galleries would be used by bona fide
> reporters who would not abuse the privilege of accreditation by importuning
> Members on behalf of private interests or causes. *Consumers Union*, 515 F.3d at
> 1347. As we explained in a later case, because the Association's denial of the
> organization's application involved regulation of the very atmosphere in
> which *lawmaking deliberations* occur, the Speech or Debate Clause barred us from
> hearing the suit. *Walker v. Jones*, 733 F.2d 923, 930 (D.C. Cir. 1984).[8]

*Barker*, 921 F.3d at 1128 (cleaned up) (emphasis in original).  No such consideration of

lawmakers' independence exists in the present case; indeed, the opposite is true: Defendants are

using House Resolution 73 to dissuade and prevent Republican members of Congress from being

able to speak, debate, or vote at all.[9]

---

[8] After 1802, "reporters were permitted on the floors of the Senate and House. This privilege
apparently was abused with considerable frequency by journalists importuning Members on
behalf of various claims before Congress. (Cong.Globe, 32d Cong., 2d Sess. 52 (1852)). For that
reason and the growing congestion on the floors, both Houses finally enacted rules permanently
removing the press from the floors of Congress. Press galleries above the floors were
eventually established and in 1888 the Senate (Cong.Directory, 50th Cong., 1st Sess. 160
(1888)), and 1916 the House (53 Cong.Rec. 1214 (1916)), entrusted their management to a
Standing Committee of Correspondents."  *Consumers Union*, 515 F.2d at 1343.

[9] The *Consumers Union* court rested its decision in part on the undisputed assumption that the
Defendants there were acting in good faith. *See* 515 F.2d at 1350. Plaintiffs make no such
concession here, and, as stated in the Amended Complaint, contend that H.R. 73 is not only
unlawful, but being implemented in a discriminatory and malign manner intentionally harassing
members of the House minority.  Am. Compl. ¶¶ 13-17, 27, & 29.

*Barker* involved the House Chaplain invoking the Speech or Debate Clause to claim immunity from suit by an atheist seeking to lead the House in prayer as a guest chaplain. *Barker*, 921 F.3d at 1121. The D.C. Circuit held that "[the House chaplain's] administration of the guest chaplain program is not an integral part of the House's deliberative and communicative processes. Judicial review of Conroy's conduct thus poses no threat to 'the integrity of the legislative process.'" *Id*. (cleaned up). Just as a chaplain's prayer prior to House deliberations does not "regulate the very atmosphere in which lawmaking deliberations occur" and "poses no threat to the integrity of the legislative process," neither does security screening or the administration of payroll deductions. *Id.* (internal citations and quotations omitted).

Defendants also rely on *Rangel v. Boehner*, a case that falls flat for Defendants because Congressman Rangel's complaint was directed explicitly to communications by House staff members during the House Ethics Committee's investigation of his misconduct. 785 F.3d 19, 21-22 (D.C. Cir. 2015). Because those staff members were doing their work in place of, and at the direction of Members themselves, and disciplinary proceedings are a function that Members have historically done themselves (prior to the growth of Congress and its reliance on staff), the *Rangel* court came to the obvious conclusion that the activities of the Members' staffs were quintessentially legislative in character, and well within the Clause's immunity that derivatively applies to staff because it applies to Members themselves. 785 F.3d at 23-25.

Providing security screenings and operating payroll are not remotely "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings," nor do they constitute "other matters which the Constitution places within the jurisdiction of the House." *Gravel,* 408 U.S. at 624-25. Notwithstanding Defendants' wishful thinking here, "the Clause has not been extended beyond the legislative sphere." *Id.* The Speech or Debate Clause simply does not reach conduct "that is in no wise related to the due

functioning of the legislative process." *Id.* at 625 (quoting *U.S. v. Johnson*, 383 U.S. 169, 172

(1966)). "The only reasonable reading of the Clause, consistent with its history and purpose, is

that it does not prohibit inquiry into activities that are casually or incidentally related to

legislative affairs but not a part of the legislative process itself." *U.S. v. Brewster*, 408 U.S. 501,

528 (1972). Providing security and administering payroll may well be important functions that

contribute to the well-being of Members and the smooth running of House operations, but the

desirability of those activities does not convert them into legislative activities, much less speech

or debate. *See Walker*, 733 F.2d at 931. Accordingly, the Speech or Debate Clause's immunity

from suit is not available to Defendants here

## C.  House Employees Are Subject to Judicially-Imposed Relief to Prevent Illegal Conduct Even if the Members of Congress Who Authorized that Conduct Are Immune from Suit.

Defendants claim that because the actions they take to execute House Resolution 73 are

pursuant to a rule enacted as part of the legislative process for which Members themselves are

immune, they therefore inherit that immunity as implementing employees. Mot. at 11-12. The

Supreme Court categorically rejected this reasoning in *Gravel.* 408 U.S. at 618-622. *Gravel*

made plain that the deliberations, communications, and debate by Members and their staff are an

entirely different function than carrying out a deed, which must be analyzed on its own merits.

*Id.*

Three controlling cases were discussed. First, in *Kilbourn v. Thompson,* the Court held

that the Speech or Debate Clause:

> [p]rotected House Members who had adopted a resolution authorizing Kilbourn's arrest; that act was clearly legislative in nature. But the resolution was subject to judicial review insofar as its execution impinged on a citizen's rights as it did there. That the House could with impunity order an unconstitutional arrest afforded no protection for those who made the arrest. The Court quoted with approval from *Stockdale* v. *Hansard*, 9 Ad. & E. 1, 112 Eng. Rep. 1112 (K. B. 1839): "'So if the speaker by authority of the House order an illegal act, though that authority shall exempt him from question, his order shall no more justify the person who

executed it than King Charles's warrant for levying ship-money could justify his revenue officer.'" 103 U.S. at 202. The Speech or Debate Clause could <u>not be construed to immunize an illegal arrest even though directed by an immune legislative act</u>.

*Gravel*, 408 U.S. at 618-19 (emphasis added) (quoting *Kilbourn*, 103 U.S. at 200, 202).[10]

Second, the *Gravel* Court noted that the Court had similarly held in *Dombrowski v. Eastland* that Speech or Debate immunity would protect a Senator, who was a subcommittee chairman, but not the committee counsel "who was charged with conspiring with state officials to carry out an illegal seizure of records that the committee sought for its own proceedings. The committee counsel was deemed protected to some extent by legislative privilege, but [the immunity] did not shield him from answering as yet unproved charges of conspiring to violate the constitutional rights of private parties. Unlawful conduct of this kind the Speech or Debate Clause simply did not immunize." *Gravel*, 406 U.S. at 619-20 (citing *Dombrowski*, 387 U.S. 82, 84 (1967)).

Finally, *Gravel* pointed out that in *Powell v. McCormack*, wherein the Court had invalidated the House's exclusion of Representative-elect Adam Clayton Powell, the Court had "afford[ed] relief against House aides seeking to implement the invalid resolutions. The Members themselves were dismissed from the case because shielded by the Speech or Debate Clause both from liability for their illegal legislative act and from having to defend themselves with respect to it." *Gravel*, 406 U.S. at 620 (citing *Powell*, 395 U.S. at 506 ("though this action may be dismissed against the Congressmen[, sic] petitioners are entitled to maintain their action against House employees and to judicial review of the propriety of the decision to exclude petitioner Powell")).

---

[10] *Kilbourne* is the controlling case that is most nearly on all fours with the present case.

In sum, *Gravel* explained:

> [i]mmunity was unavailable [to congressional employees] because they engaged in illegal conduct that was not entitled to Speech or Debate Clause protection. The three cases [*Kilbourn, Dumbrowski,* and *Powell*] reflect a decidedly jaundiced view towards extending the Clause so as to privilege <u>illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings</u>. In *Kilbourn*, the Sergeant-at-Arms was executing a legislative order, the issuance of which fell within the Speech or Debate Clause; in [*Dumbrowski*], the committee counsel was gathering information for a hearing; and in *Powell*, the Clerk and Doorkeeper were merely carrying out directions that were protected by the <u>Speech or Debate Clause</u>. In each case, protecting the rights of others <u>may have to some extent frustrated a planned or completed legislative act; but relief could be afforded without proof of a legislative act</u> or the motives or purposes underlying such an act. No threat to legislative independence was posed, and Speech or Debate Clause protection did not attach.

*Gravel*, 408 U.S. at 620-21 (emphasis added).  *McCarthy*, to which Defendants point, is not to the contrary, as the court there specifically acknowledged that "voting" was a core legislative act, as were the acts required of House staffers to implement the rule at issue.  2021 U.S.App. LEXIS 21399 at *7-8, 13-14.

This Circuit likewise recognizes the distinction between legislative acts and execution thereon for purposes of ascertaining when Speech or Debate immunity applies.  As then-Judge Ginsberg pointed out, "The Supreme Court has drawn a key distinction, 'between legislative speech or debate and associated matters such as voting and committee reports and proceedings,' on the one hand, and 'executing a legislative order,' or 'carrying out legislative directions,' on the other hand.  The former, the Supreme Court has emphasized, is what the  Speech or Debate Clause shields."  *Walker*, 733 F.2d at 931-32 (cleaned up) (citing *Gravel,* 408 U.S. at 620-21; *Doe v. McMillan*, 412 U.S. 306, 314-15 (1973)).  Carrying out a decision, "even if the decision itself is properly called 'legislative,' is not cloaked with Speech or Debate immunity, for execution or carrying out directions post-dates what the Clause protects -- the *process* leading up to the issuance of legislative directions."  *Walker*, 733 F.2d at 932 (emphasis in original).

Members of Congress may have immunity for discussing and voting for an unconstitutional rule. But congressional employees, like the Sergeant-at-Arms and Chief Administrative Officer, are not immune from a judicial order forbidding the implementation of such a rule.

## II.     Plaintiffs Have Stated Claims Upon Which Relief Can Be Granted.

### A.  The Fines Levied Under the Rule Violate the Twenty-Seventh Amendment by Varying (Reducing) Members' Actual Compensation.

The Twenty-Seventh Amendment states that "No law varying the compensation for the services of the Senators and Representatives shall take effect, until an election of Representatives shall have intervened."  U.S. Const., Amend. XXVII.

### 1.  A Primary Purpose of the 27th Amendment is to Prevent Congressional Salaries From Being Decreased, a Practice the Founders Expressly Recognized Could Be Used to Threaten the Integrity and Independence of Members, and Dissuade Individuals of Modest Means from Serving in Congress.

What is today known as the Twenty-Seventh Amendment began its odyssey to enactment as the second amendment in the original Bill of Rights draft proposed by James Madison and adopted by the First Congress in 1789.[11]  *See generally,* Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment*, 61 FORDHAM L. REV. 497, 521-31 (Dec. 1992) ("*Sleeper*").  Between 1789 and 1791, this "compensation amendment" was ratified by only six states, making it ineligible to join the ten amendments that were approved as the Bill of Rights.  *Id.* at 532-33. In response to a large (and retroactive) pay increase Congress granted itself in 1873 that became publicly known as the "Salary Grab," Ohio added its name to

---

[11] The original proposed first amendment concerned the maximum number of people who would be represented by each Member of the House. *See Sleeper*, 61 FORDHAM L. REV. at 530-31 N.171 (citing Creating the Bill of Rights: The Documentary Record from the First Federal Congress) (Helen E. Veit et al. eds. 1991).  Madison's proposed amendments three through twelve were ratified by a sufficient number of states in 1791, becoming what we know today as the Bill of Rights.  *See Sleeper*, 528-31.

the states ratifying the amendment that year. *Id.* at 534. Nothing happened to the amendment for more than 100 years, until 1978, when Wyoming also ratified it. *Id.* at 537. Then, Maine ratified the proposed amendment in 1983, beginning a cascade of state ratifications,[12] with Michigan providing the 38th approval necessary to make it the 27th Amendment to the Constitution in 1992. *Id.* at 537, 539 n.214.

While the 27th Amendment is commonly thought of today as a limitation on Congress's ability to vote itself a pay raise, that was but one of the purposes animating its origination and ratifications.[13] Defendants acknowledge only the limitation on congressional self-enrichment as a rationale for the Amendment, but fail to address the other purposes. *See* Mot. at 13. Had pay raises been the only concern, the language would have stated as much. But that was not the only reason for the 27th Amendment, which prohibits any law "varying the compensation," not just those that increase it.

Americans' understanding of British parliamentary practice is vital to construing the purpose of the Constitution they adopted in 1787. *See, e.g, Timbs v. Indiana*, 139 S.Ct. 682, 695 (2019) (Thomas, J. concurring) (looking to Parliamentary practice in construing the meaning of

---

[12] The sudden interest in the long-moribund proposed amendment was driven by Gregory D. Watson, a sophomore at the University of Texas-Austin, who, while looking for a paper topic for a government class, discovered that the proposed amendment could be ratified because, unlike for later amendment proposals, Congress had put no time limit for state ratifications. He wrote his paper on it, arguing that the amendment could–and should–be ratified. Unimpressed, his professor gave him a "C," telling him the amendment was a "dead letter and would never become part of the Constitution." *Sleeper*, 61 FORDHAM L. REV. at 536-37. Undeterred, Watson began a one-man, decade-long crusade for the amendment's ratification. After his success, his professor retroactively changed his grade to an "A" in 2017. Ken Herman, Herman: *35 Years Later, A+ for Austinite Who Got Constitution Amended?* Austin-American Statesman (March 14, 2017).

[13] Ratifications *after* the founding period were clearly motivated by opposition to particular pay increases which Congress voted for itself at various points during the 203-year ratification process for the 27th Amendment. *See Sleeper* at 533-40.

the Eighth Amendment's Excessive Fines Clause); *U.S. v. Cabrales*, 524 U.S. 1 n.1 (1998)

(Ginsburg, J.) (in construing Constitution's criminal venue requirement, pointing to American

colonists' negative reaction to Parliament's practice of haling Americans to Britain for trial);

*Engel v. Vitale*, 370 U.S. 421, 425-27 (1962) (in construing Establishment Clause, discussing

Americans' negative reaction to Parliament dictating religious practices); *McGrain v. Daugherty*,

273 U.S. 135, 161 (1927) (noting Parliamentary power in determining Congressional

constitutional authority to compel witness testimony).  In addition to the threats posed by

congressional self-aggrandizement, the Founders were also greatly concerned that diminishing

congressional pay could be used to pressure Members from exercising independent judgment and

to prevent qualified men of modest means from serving in the new national legislature.  The

founding generation was well-aware, for instance, of the practice of candidates for the British

House of Commons of promising to reduce (or even eliminate!) their wages to garner popularity

with their constituents, which had that very effect.  *Sleeper* at 500-01.[14]  Americans in the 1770s

and 1780s found such conduct debasing to the notion of representative government, and believed

it had "led members of Parliament to override the Americans' rights under the British

constitution" *Id.* at 501.[15]

Similarly relevant in ascertaining constitutional meaning are the Founders' understanding

of the colonial and state legislative practices prior to 1789.  *See, e.g., Kisor v. Wilkie*, 139 S.Ct.

2400, 2437 (2019) (Gorsuch, J., concurring) (noting colonial legislative interference with judicial

independence in the context of evaluating permissible deference under the Constitution executive

---

[14] Citing 1 Edward Porritt with Annie G. Porritt, The Unreformed House of Commons: Parliamentary Representation Before 1832, at 151-203 (1909).

[15] Citing 1 Poritt. at 96-98; The Eighteenth-Century Constitution: 1688-1815, at 151-52 (E. Neville Williams ed., 1960); Bernard Bailyn, The Ideological Origins of the American Revolution 46-51, 85-93, 130-138 (enlarged ed. 1992).

rulemaking); *Horne v. Dept. of Agric.,* 576 U.S. 351, 359 (2015) (analyzing Takings Clause with reference to the New York Legislature's reaction to property seizures by the Continental Army); *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure, Ltd.,* 536 U.S. 88, 94-95 (2002) (analyzing Article III's alienage jurisdiction with reference to state legislatures' practices during and after the Revolutionary War).  From 1774 until the Constitution's ratification in 1789, during the Continental Congresses and into the period of the Articles of Confederation, state legislatures, who were responsible for paying their congressional delegates, used that leverage to punish Congress for ignoring state interests, and those delegates were an easy target for fiscal belt-tightening during the poor economy that followed the American Revolution.  *Sleeper* at 501-02.[16]  Delegates had to wait longer and longer to be paid, if at all.  "Even those delegates who had independent means, and thus did not rely on the small salaries paid by the states, did not accept this situation lightly. Notable American politicians began to write scathing letters to their home states, demanding to know how long they were to serve their country without being paid for it." *Id.* at 502.[17]

Hence, the new national legislature's independence and stability was a major concern at the 1787 Constitutional Convention.  *Id.*[18]  In discussing how congressional pay should be set in the context of debating what eventually became known as the Constitution's "Ascertainment

---

[16] Citing Jack P. Greene, The Quest for Power (1963); Edmund Cody Burnett, The Continental Congress 420, 421, 425, 629, 650, 710, 713 (1941); Richard B. Morris, The Forging of the Union, 1781-1789, at 91-94 (1987); Jack N. Rakove, The Beginnings of National Politics: An Interpretive History of the Continental Congress 235-38 (1979)

[17] *See* sources cited *supra,* note 16.

[18] Citing 1 The Records of the Federal Convention of 1787, at 20-22 (Max Farrand ed., 1937) (all references are to James Madison's notes unless otherwise indicated).

Clause,"[19] the delegates avidly debated the potential harms of insufficient congressional remuneration, or its potential diminishment.  These discussions are highly relevant in ascertaining the Founder's concerns regarding congressional compensation.  *See, e.g., Sch. Dist. of Abingon Twp. v. Schemp*, 374 U.S. 203, 254 n.19 (Brennan, J., concurring) (discussing Convention debates on religion to clarify later-ratified First Amendment);  *Rucho v. Common Cause*, 139 S.Ct. 2484, 2495 (2019) (referring to the Convention debate in ascertaining the authority granted under Article I's Election Clause);  *Singer v. U.S.*, 380 U.S. 24, 31 (1965) (discussing the Convention's insights into the criminal venue requirement of  Article III in tandem with the later-ratified Sixth Amendment); *U.S. Term Limits v. Thonrton*, 514 U.S. 779, 790-91 (1995) (analyzing the meaning of Article I's Qualifications Clause with reference to the Convention discussions); *Weiss v. U.S.*, 510 U.S. 163, 187 n.2 (1994) (Souter, J., concurring) (discussing Convention debate in the context of analyzing the Appointments Clause)

Echoing the well-known concern about House of Commons candidates seeking voter favor by promising to cut their pay, Massachusetts delegate Elbridge Gerry[20] noted as "one principal evil" of democracy was "the want of due provision for those employed in the administration of Governnt [sic]. It would seem to be a maxim of democracy to starve the public servants."  1 The Records of the Federal Convention of 1787, at 48 (Max Farrand ed., 1937). Virginia delegate George Mason raised the problematic history of low pay discouraging capable men from public service, "[t]he parsimony of the States might reduce the provision so low as had

---

[19] "The Senators and Representatives shall receive a compensation for their services, to be ascertained by law, and paid out of the treasury of the United States." U.S. Const., Art. 1, § 6, cl.1.

[20] Later Governor of Massachusetts, Gerry gifted his name to the American political lexicon in the word "gerrymandering." *See generally, https://www.smithsonianmag.com/history/where-did-term-gerrymander-come-180964118/.*

already happened in choosing delegates to Congress, the question would be not who were most

fit to be chosen, but who were most willing to serve." *Id* at 216.  Nathaniel Gorham of

Massachusetts and Edmund Randolph of Virginia both raised the threat to congressional

independence created by the possibility of salary reductions. Gorham pointed out that state

legislatures "were always paring down salaries in such a manner as to keep out of offices men

most capable of executing the functions of them." *Id* at 372.  Randolph, in turn, stressed that

"[i]f the States were to pay the members of the Natl. Legislature, a <u>dependence would be created</u>

that would vitiate the whole System." *Id.* (emphasis added).  In stark contrast, only one delegate,

Benjamin Franklin, suggested that federal legislators should receive no salary whatsoever, a

suggestion the other delegates tabled without comment.  *Id.* at 81-85.

With the proposed Constitution setting no restraint on either increasing or decreasing

congressional salaries, it became the second of Madison's proposed amendments in the Bill of

Rights he offered in the First Congress. As in the Constitutional Convention, Representatives

discussed the sorry history of the House of Commons manipulating wages.  Congressman

Theodore Sedgwick stated that 'designing men'…

> … might reduce the wages very low, much lower than it was possible for any
> gentleman to serve without injury to his private affairs, in order to procure
> popularity at home, provided a diminution of pay was looked upon as a desirable
> thing; it might also be done in order to prevent men of shining and disinterested
> abilities, but of indigent circumstances, from rendering their fellow citizens those
> services they are well able to perform, and render a seat in this house less eligible
> than it ought to be.

Debates in the House of Representatives (Aug. 14, 1789), *in* The Congressional Register, Aug.

14, 1789.  This view, too, demonstrates that diminution of salary was as much a consideration for

the Founders as were pay raises.  *See, e.g., Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1903

(2021) ("Since the First Congress also framed and approved the Bill of Rights, we have often

said that its apparent understanding of the scope of those rights is entitled to great respect.").

It is beyond dispute that based on the Revolutionary dismay over Parliamentary reductions in pay, the Founders' understanding of the way national legislators could be dissuaded from independent judgment, and the threat of excluding those of modest means from public service all informed the enactment of the 27th Amendment.  Those critical concerns are precisely what underlie this case: The manipulation of salary by the House Democratic Majority to deprive Republican Members of their political independence and financial ability to serve.  "In the general course of human nature, a power over a man's subsistence amounts to a power over his will."  Alexander Hamilton, *Federalist Paper No. 79* (May 28, 1788).  *See also Schaffer v. Clinton*, 240 F.3d 878, 884-85 (10th Cir. 2001) (noting that Hamilton was speaking of a *decrease* in pay, and that such a decrease would be a real injury providing standing under the 27th Amendment).  The 27th Amendment was enacted not just to prevent congressional self-dealing from pay increases, but to protect Members from pay *decreases* being used as an instrument for either political pressure or exclusion.

### 2. House Resolution 73 is a "Law" that Varies Compensation in Violation of the 27th Amendment.

The text and tradition of a constitutional provision control its interpretation.  *See, e.g,, Torres v. Madrid,* 141 S.Ct. 989, 995-96 (2021); *District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008) (the Constitution's "words and phrases were used in their normal and ordinary as distinguished from technical meaning," as understood by ordinary voters); *see also, Callins v. Collins*, 510 U.S. 1141 (Scalia, J., concurring).  Notwithstanding Defendants' importunements to the contrary, House Resolution 73 is a "law" for purposes of the 27th Amendment. By its plain terms, the Amendment applies not just to "statutes," but to "law."  Nothing in the text or the history of the Amendment suggests that "no law" applies only to statutes enacted pursuant to bicameralism and presentment.  The opposite is true.  The Supreme Court, the D.C. Circuit, this

Court, and Congress itself all recognize that a congressional rule is a "law" subject to the provisions of the Constitution.

"[T]he courts will intervene to protect constitutional rights from infringement by Congress, including its committees and members." *Exxon Corp. v. FTC*, 589 F.2d 582, 590 (D.C. Cir. 1978) (citing *Yellin v. United States*, 374 U.S. 109, 143-144 (1963); *Watkins v. United States*, 354 U.S. 178, 188 (1957); *U.S. v. Ballin*, 144 U.S. 1, 5 (1892); *Jordan v. Hutcheson*, 323 F.2d 597 (4th Cir. 1963)). "The Bill of Rights is applicable to . . . all forms of governmental action." *Watkins*, 354 U.S. at 188. Where constitutional rights are violated, the judiciary has warrant to interfere with Congress's internal procedures. *Exxon*, 589 U.S. at 590.

As already explained in Part I.A., *supra*, the Supreme Court expressly held in *Ballin* that the houses of Congress "may not by [their] rules ignore constitutional restraints or violate fundamental rights." 144 U.S. at 5. Unambiguous House rules, such as the mandatory payroll deduction of punitive fines required under H.R. 73, are plainly subject to judicial review. *U.S. v. Rostenkowski*, 59 F.3d 1291, 1307 (D.C. Cir. 1995).

Defendants mistakenly rely on *Boehner v. Anderson* for the proposition that only statutes that are the product of bi-cameralism and presentment are a "law" for purposes of the 27th Amendment. Mot. at 15-16, citing 30 F.3d 156 (D.C. Cir. 1994). The *Bohener* court made no such suggestion, and the case did not even purport to pose the question of what governmental actions constituted a "law" under the Amendment. *See id.* at 158-59. The only "law" at issue there was a statute challenged by then-Congressman Boehner that authorized automatic cost-of-living increases in subsequent sessions of Congress. *Id.* The D.C. Circuit rejected Boehner's argument, correctly holding that nothing in the 27th Amendment obligated Congress to enact a new law for each separate pay raise; only an intervening session between the enacting law and

31

any subsequent pay adjustment was required by the plain language of the Amendment. *Id* at

160-62.

Like the houses of Congress, the federal courts are empowered to enact their own rules,

and the Supreme Court has held that a local court rule was a "law" for purposes of the federal

perjury statute. *U.S. v. Hvass*, 355 U.S. 570, 574-75 (1958). Incorporating the common

understanding that a "rule" issued by a governmental institution with binding effect is a "law,"

the *Hvass* Court explained:

> The phrase "a law of the United States," as used in the perjury statute, is <u>not limited
> to statutes, but includes as well Rules and Regulations which have been lawfully
> authorized and have a clear legislative base</u>.
>
> 28 U.S.C. § 2071 provides: "The Supreme Court and all courts established by Act
> of Congress may from time to time prescribe rules for the conduct of their business.
> Such rules shall be consistent with Acts of Congress and rules of practice and
> procedure prescribed by the Supreme Court." . . . Consistently, Rule 83 of Federal
> Rules of Civil Procedure, in pertinent part, provides: "Each district court by action
> of a majority of the judges thereof may from time to time make and amend rules
> governing its practice not inconsistent with these rules. . . " These statutes and Rule
> 83 leave no room to doubt that <u>the District Court was lawfully authorized to
> prescribe its local rules and that they have a clear legislative base</u>.

*Id*. at 575-76 (citations omitted) (emphasis added). *Accord, Columbia Broadcasting System, Inc.*

*v. U.S.*, 316 U.S. 407, 416 (1942) (an agency rule that has binding legal effect on those it

regulates is a "law"). The House has issued a rule with binding legal effect on its Members,

which makes it a "law" for purposes of constitutional scrutiny.

"When seeking to discern the meaning of a word in the Constitution, there is no better

dictionary than the rest of the Constitution itself." *Arizona State Legislature v. Arizona Indep.*

*Redistricting Comm'n*, 576 U.S. 787, 829 (2015) (Roberts, C. J., dissenting);

*cf. Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 60 (2014) (Kagan, J., for the Court) ("'[W]ords

repeated in different parts of the same statute generally have the same meaning'"

(quoting *Law* v. *Siegel*, 571 U.S. 415, 422 (2014)). The same terminology used in

contemporaneously drafted constitutional provisions presumably carry the same meaning.  *See U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (reasoning that "the people" is "a term of art employed in select parts of the Constitution and has the same meaning in each part of the Constitution").  As explained in Part II.A.2*, supra*, the term "no law" in Madison's original proposed second amendment that became the 27th Amendment was drafted in the same Bill of Rights proposal as the "no law" found in the First Amendment.  If "no law" in the First Amendment covers the rules of each congressional house, so too must those rules be covered by the "no law" provision of the 27th.

Furthermore, no less a figure than John Quincy Adams believed that a House rule was a "law" governed by the strictures of the First Amendment.  After his Presidency ended in 1829, Adams rejoined the House in the House in 1831.  From 1837 until 1844, the House imposed what was infamously known as the "Gag Rule," whereby any petitions concerning slavery were automatically tabled, with the slavery topic put off-limits for debate.  Adams argued strenuously for nearly eight years that the Gag Rule was an explicit violation of the First Amendment's requirement that "Congress shall make no law . . . abridging . . . the right of the people to petition the Government for a redress of grievances." U.S. Const., Amend. I.  During the voting on the Gag Rule in the 25th Congress, in December of 1837, rather than answer with a vote, Adams said "'I hold the resolution to be a violation of the Constitution of the United States…' before he was silenced by calls to order. The next day he completed his remark, ' … of the rights of my constituents, and of the people of the United States to petition, and of my right to freedom of speech, as a member of this House.'"  Robert P. Ludlum, "*The Antislavery 'Gag-Rule': History and Argument,*" 26 J. OF NEGRO HIST. No. 2 at 210-11 (April 1941) (internal citation omitted).

This Court has come to a similar conclusion, holding by necessary implication that the First Amendment's "Congress shall make no law" phrase applies even to House regulations

concerning the display of artwork in the U.S. Capitol. *Washington Activity Group v. White*, 342 F.Supp. 847, 848-50, 852-55 (D.D.C. 1971), *aff'd*, 479 F.2d 922 (D.C. Cir. 1973). In *White*, the Court held that even though the houses of Congress were entitled to great deference in formulating standards for internal governance, those standards could be invalidated if they violated First Amendment protections. *Id.* at 852-53. If the House regulations in *White* weren't "law," the court could not have found them violative of the First Amendment, which by its terms, applies only to "law."

The untenability of Defendants' claim that their rule may escape constitutional scrutiny because it is not a statute passed by both Houses of Congress and presented to the President is belied by the Supreme Court's recent decision in *NLRB v. Canning*, 573 U.S. 513 (2014). In *Canning*, the Court held, consistent with its earlier jurisprudence on the justiciability of the rules of each chamber, that although the Senate's own view as to when it was "in session" under its own rules was entitled to great deference, it is ultimately the judiciary's role to determine if those decisions are consistent with the controlling constitutional provisions. *Id.* at 551-52. In the same vein, the D.C. Circuit held in *Michel v. Anderson* that the judiciary had both the right and the obligation to ascertain if a House rule granting certain voting rights to Delegates from U.S. territories complied with Article I of the Constitution 14 F.3d 623, 627 (D.C. Cir. 1994) ("[W]ere the House to create members not 'chosen every second year by the People of the several states,' and bestow upon them full voting privileges, such an action, whether or not pursuant to House rules, would be blatantly unconstitutional. Therefore, the question presented in this case–whether granting delegates the power to vote in the Committee of the Whole bestows a status equivalent to membership on the delegates–cannot be thought to have been delegated by the Constitution to the House to decide. There are limitations to the House's rulemaking power, and Art. I, § 2 is such a limit."). The same principal applies here: H.R. 73 is "a law" for purposes of the 27th

Amendment that this Court must not only take cognizance of, but which plainly contravenes the requirement that Member compensation not be "varied."[21]

House Resolution 73 "varies compensation" of the Members by specifically and explicitly targeting their salary.  "If a Member… against whom a fine is imposed by the Sergeant-at-Arms under [this resolution] has not paid the fine prior to the expiration of the [relevant time period], the Chief Administrative Officer _shall_ deduct the amount of the fine from the net salary otherwise due the Member."  H.Res. 73, § 1(c)(1)(emphasis added).  And lest there be any doubt that the fines at issue are specifically directed against Members' salaries, Section 1(d) of the Resolution explicitly forecloses other ways Members might have paid the fines in question – leaving only their salary or other personal funds to answer.  This ensures maximum pressure is brought to bear on those Members who rely on their Congressional salary as their sole or primary means of support. [22]

---

[21] Defendants understandably cite to a recent essay in support of their contention that only statutes are laws limited by the Amendment.  Mot. at 16-17, citing GianCarlo Canaparo & Paul J. Larkin, Jr., _The Twenty-Seventh Amendment: Meaning and Application_, Harv. J.L & Pub. Pol'y (Sept. 2, 2021) at 9-11.  While an interesting philosophical rumination on what the authors think the Amendment should mean, the essay fails to grapple with a single one of the multitude of cases holding that congressional rules are constrained by constitutional strictures, and therefore, justiciable.

[22] The Plaintiffs in this case readily exemplify the Founder's concern for the use of pay to exert pressure, as Representative Gohmert relies on his Congressional salary as his primary means of support, while Representatives Clyde and Smucker deduct nearly all of their paychecks to pay their federal withholding taxes, as they have the benefit of prior saved income from which they can sustain themselves until they file their tax returns each year.  Representative Gohmert, who lives off his Congressional salary, is facing the forcible deduction of $277.77 from each of his remaining monthly paychecks for the duration of this Congress to pay his $5,000 fine.  At the same time, Representatives Clyde and Smucker are having approximately one dollar ($1.00) deducted from each of their remaining monthly paychecks to pay their fines of $15,000 and $5,000 respectively, because such deductions for the fines herein occur following deductions for taxes, and they have arranged to deduct nearly all of their salary to pay taxes.

Defendants mistakenly claim that "fines imposed and collected pursuant to House Resolution 73 do not change the 'compensation for services' of House Members."  Mot. at 13. While the fines may not change the underlying salary level of $174,000 per annum, it defies logic (and math) to suggest that deducting money – $5,000 or $15,000 per Plaintiff – does not vary, i.e., reduce, those Members' actual compensation for their services.  The fine reduces the Member's salary before he ever receives it.

Defendants express dismay that a plain text reading of the 27th Amendment striking down H.R. 73 might also invalidate other statutes and rules.  Mot. at 18-19, citing, *e.g*, 2 U.S.C. § 4523 (authorizing the House Chief Administrative Officer to "deduct from any salary" of any Member any "delinquent sum" he owes but "fail[ed] to pay").[23]  This statute is not at issue here, but even if Defendants are correct, it goes without saying that ratification of a constitutional amendment necessarily invalidates prior laws that violate the amendment's strictures.  *See, e.g., Neal v. Delaware*, 103 U.S. 370, 389-90 (1881) (The adoption of the 15th Amendment invalidated the provision of the Delaware Constitution restricting suffrage to whites.). Furthermore, whatever authority Congress may have had to fine Members and deduct those fines directly from Member salaries prior to 1992, the 27th Amendment now precludes such authority, at least for punitive fines imposed under the guise of disciplining disorderly behavior.[24]

---

[23] Defendants point to the vote on the comprehensive rules package at the outset of the 115th Congress, Mot. at 19, for which two of the Plaintiffs voted. Defendants correctly note that enforcement of the 27th Amendment would invalidate fines that theoretically could have been imposed under the particular portion of the rule they reference.  At the time of passage, the constitutional difficulty was neither noted nor discussed.  Plaintiffs are unaware of any fine issued under the referenced rule, and would note that – unlike H.R. 73 – the rules introduced at the commencement of the 115th Congress were not undertaken in bad faith.

[24] Plaintiffs take no position in this case on salary deductions for absences, restitutionary fines, or individual court-ordered garnishments, as such circumstances may be governed by considerations not relevant to this case.  Nor are voluntary deductions impinged by this action.

**B.  The Imposition of Fines for Behavior that is Not Disorderly is Beyond the Power of the House Under Article I, § 5.**

Article I, § 5, clause 2 of the Constitution provides that "[e]ach House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member."  Under *Ballin*, Members may be punished only for behavior that is "disorderly," which is a textual "constitutional restraint" on that for which a Member may be punished. 144 U.S. at 5.  Defendants engage in self-serving circular logic by seeking to define "disorderly" as any "conduct that is 'contrary to rules'."  Mot. at 20.  Such a definition reaches beyond the constitutional limit.

Defendants may not use the House's internal rulemaking authority to shield actions that reach beyond the power of the House itself.  *Kilbourne*, 103 U.S. at 182; *Ballin*, 144 U.S. at 5. In this case, those acts include levying fines against Members' salary for behavior that is not "disorderly," as well as detaining Members from floor access via threat of such fines.  "[T]he specific enumeration of the particular classes of cases ought to be construed as excluding all others not enumerated, upon the known maxim, . . . *expressio unius est exclusio alterius.  Ex parte City Bank of New Orleans*, 44 U.S. 292, 313 (1844) (Story, J.).  Here, the Discipline Clause permits the House to punish only conduct that is disorderly (a term with substantive meaning), not just any infraction of the rules.  Were it otherwise, an oppressive House majority could enact any rule it wished to enable punishments against the minority, just as the Resolution is being carried out in the present case.

Neither the Constitution itself nor any case defines the meaning of "disorderly behavior" as used in the Discipline Clause, and it should be given its ordinary meaning as understood at the time of ratification.  Using a reference relied upon by Defendants, the most applicable definition of "disorderly" – used in the Constitution as an adjective – is "irregular; tumultuous," not the

aforementioned circular definition suggested by Defendants.  Samuel Johnson, A Dictionary of the English Language, (1785).[25]

Plaintiffs advance the entirely plausible position – particularly in a case of first impression – that a Member walking into the House Chamber, with no suspicion or allegation of wrongdoing by that Member (e.g., having threatened another Member), is not "disorderly" behavior that can be punished by the expedient of the majoritarian House passing a rule requiring Members to submit to security screenings.  There is nothing "irregular or tumultuous," much less "riotous or indecent" about a Member entering into the House Chamber.  In fact, there could hardly be a more ordinary occurrence in the course of a Member's day.[26]  The baselessness of Defendants' claim that rulebreaking, *ipso facto*, is "disorderly conduct" is belied by the fact that no tumult arose in the House's proceedings upon the Rule's violation by Speaker Pelosi, Chairwoman Waters, and other Member of the House majority party.

Defendants are executing a punishment against Members for actions that, cast in the light most favorable to Defendants' position, is two logical steps removed from disorderly behavior.[27]

---

[25] "Disorderly" is a word whose meaning has changed little, if at all, since the founding period. *See, e.g.,* Black's Law Dictionary, 6th ed., 1991 (abridged), still defined the word as: "violative of the public peace or good order; turbulent, riotous, or indecent" (exclusive of its reference to rules, that being circular in the present case).

[26] *See also,* Justice John Marshall Harlan: *Lectures on Constitutional Law, 1897-98, Lecture 7, Nov. 20, 1897*, 81 GEO. WASH. L. REV. Arguendo 12, 84 (July 2013) ("'Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour ....' Punish them, how? ... Put him in jail if he is guilty of misbehavior. If a member of the House should stagger into that body some day drunk, that is disorderly behavior. He can be fined by that body, and punished for that disorderly behavior.").

[27] In light of the purposes Defendants argue underlie the Resolution, *see* Mot. at 1, the two logical steps of separation from disorderly behavior are, first, firearms are forbidden on the Floor of the House.  Given that the mere act of possessing a firearm is not disorderly behavior, the exclusion of firearms is a prophylactic measure that is one step removed from disorderly behavior. Second, Defendants assert that the purpose of the Resolution is to enforce the ban on firearms, and given that the mere act of walking onto the Floor of the House cannot reasonably be deemed

In executing House Resolution 73, Defendants, by their own argument, are simply providing assurances that other rules – those closer to actual disorderly behavior – are abided by.  Again, at the current stage of pleading, the plausibility of Plaintiffs' position is all that is required to deny Defendants' Motion to Dismiss on this ground.

Defendants' recitation of fines imposed prior to 1992 is inapposite, especially those that rely on explicit provisions in the Constitution other than the Discipline Clause, such as that which addresses the attendance of Members. Mot. at 21; Art. I, § 5, cl. 1.  Similarly, unchallenged fines since 1992 are no bar to the present case.  In *Powell v. McCormack*, 395 U.S 486, 541-48 (1969), Congress sought to exclude Representative Powell from being seated, but, *inter alia*, the Supreme Court rejected House Defendants' arguments that prior exclusions of other Members demonstrated the constitutionality of the practice, holding that the prior exclusions did not demonstrate the constitutionality of the practice where none of the previously-excluded members had judicially challenged their exclusions.  The *Powell* Court further held that such exclusions were unconstitutional when done for reasons beyond the limits of the Qualifications Clause.  *Id*. at 550; *see also*, *Ballin*, 144 U.S. at 5.

---

to be disorderly behavior, such a further prophylactic measure is a second step removed from actual disorderly conduct.

Furthermore, in the House's entire history, there has been only one incident involving even the alleged near-brandishing of a firearm by a Member on the Floor (i.e., the firearm, if there was any, was not drawn out), and that was in the 1850s, at a time when there was no rule forbidding the carrying of firearms on the Floor of the House.  *See* https://history.house.gov/Historical-Highlights/1851-1900/A-Near-Gun-Fight-on-the-House-Floor/

### C.  The Arrest Clause Bars the Implementation of House Resolution 73 In A Manner that Denies Members the Ability to Speak, Debate & Vote.

Just this past term, the Supreme Court explained in great detail that at the time of the Founding, an "arrest" occurs when a person submits to authority.  *Torres v. Madrid*, 141 S.Ct. 989, 995-99 (2021) (collecting authorities).  Article I, § 6, cl. 1, provides in pertinent part, "[Representatives] shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place."  This provision reflects the Founders concern that members of Congress should have the same ability to discharge their duties without being detained as existed in Parliament at the time.  *See Williamson v. U.S.*, 207 U.S. 425, 439-40, 443 (1908).

Defendants correctly observe that the Arrest Clause is a term of historical art, which includes within the meaning of "breach of the peace" all criminal actions, which has the effect of exempting Members from only civil arrest during the performance of their duties.  *Long v. Ansell*, 293 U.S. 76, 82-83 (1934) (citing *Williamson,* 307 U.S. at 436-46).  The extent of the meaning of a "civil arrest" is entirely unclear in the modern context, but the provisions created by the House to enforce H.R. 73 do not have the accoutrements of a criminal proceeding, such as a requirement that the House prove Plaintiffs' guilt beyond a reasonable doubt, the  presumption of the Member's innocence, or a requirement that the Ethics Committee come to a unanimous determination of the Member's guilt.  *Cf. In re Winship*, 397 U.S. 358, 365 (1970) (fundamental aspect of a criminal proceeding is heightened burden of proof); *Foucha v. Louisiana*, 504 U.S. 71, 94 (1992) (Kennedy, J., dissenting) (noting the presumption of innocence inherent in a criminal prosecution); *Ramos v. Louisiana*, 140 S.Ct. 1390, 1397 (enforcing jury unanimity requirement as fundamental for criminal prosecutions).  Hence, the "arrest" occasioned by the

agents of the Sergeant-at-Arms by detaining Members for screening and preventing them from performing their duties on the Floor is not criminal, and thus must be in the nature of a civil arrest.

The temporary detention effectuated by the agents of the Sergeant-at-Arms is accomplished by means of the threat of the enormous fines imposed under House Resolution 73.[28]  That threat forced not only Plaintiff Representative Clyde to miss a vote, Am. Compl. ¶ 28, but other Members as well.  *Id.* ¶ 29.  Furthermore, even under a circumstance when the alleged purpose(s) of House Resolution 73 could be achieved without blocking the exercise of the right (and duty) to vote, Plaintiff Representative Smucker was fined anyway.  Am. Compl. ¶¶ 24-25 (noting that Plaintiff Smucker informed the agents of the Sergeant-at-Arms that he would vote and immediately return, and remained in their sight to vote and return to their post).

Defendant Sergeant-at-Arms disclaims responsibility or authority over the particular individuals performing the security screening at issue; however, House Resolution 73 directs the Sergeant-at-Arms – not the Capitol Police – to implement "security screening," thus it is accomplished under his authority and with no requirement under the Resolution that magnetometers (or any other means that would impose delay) be used for the purpose.  *See* Mot. at 23; H. Res. 73§ 1(a).  In the event the Court determines otherwise, Plaintiffs request leave to add the United States Capitol Police as additional Defendants.  To achieve the purpose of the Arrest Clause, non-criminal detentions like those here that can cause a Member to miss speech, debate, and votes, must be forbidden.  U.S. Const., Art. I, § 6, cl. 1. The House may promulgate

---

[28] The last reason Defendants cite for the Resolution is that it will ensure that Members are free to serve their constituents (from Defendants' perspective) without concern about firearms or weapons.  However, the implementation of H.R. 73 frequently results in the detention – not the freedom – of Members, demonstrably resulting in Members missing votes.  *See* Am. Compl. ¶¶ 27 & 29.

rules to ensure its safety, but it must do so by methods that do not interfere with the body's core

constitutional functions by its Members.

## **CONCLUSION**

In light of the foregoing, Plaintiffs respectfully request that Defendants' Motion to

Dismiss be denied, and Plaintiff further request to be heard on this matter in oral argument.

Respectfully submitted,
CONGRESSMAN ANDREW S. CLYDE
CONGRESSMAN LOUIS GOHMERT
CONGRESSMAN LLOYD SMUCKER

/s/
By Counsel
Earl "Trey" Mayfield, D.C. Bar # 459998
tmayfield@jurisday.com
Juris Day, PLLC
10521 Judicial Dr., #200
Fairfax, Virginia 22030
Voice: (703) 268-5600
Facsimile: (703) 268-5602

Kenneth T. Cuccinelli, II
kcuccinelli@kencuccinelliattorneyatlaw.com
Ken Cuccinelli Attorney at Law
13881 Jordan Meadows Lane
Nokesville, Virginia 20181
*Counsel for Plaintiffs*

Dated: September 17, 2021 – Constitution Day.